UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GLOBAL HEALING CENTER LP, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 4:14-CV-269 |
| | § | |
| NUTRITIONAL BRANDS INC, *et al*, | § | |
| | § | |
| Defendants. | § | |

**OPINION AND ORDER**

Pending before the Court is Plaintiff Global Healing Center LP's ("GHC") First Amended Application for Preliminary Injunction.  Doc. 15.  GHC alleges (1) trademark infringement; (2) trademark dilution; (3) trademark tarnishment; (4) trade dress infringement; (5) tortious interference with existing contract; (6) unfair competition under the Lanham Act; (7) request for declaratory relief; (8) common law unfair competition; (9) breach of contract; (10) fraud; (11) action to compel arbitration; and (12) trademark counterfeiting.  *Id.* ¶ 30–96.  Upon review and consideration of the application, the response, the supplemental briefs, the testimony and evidence presented at the hearing held on February 26, 2014, and the applicable law, the Court grants GHC's application for preliminary injunction.

I.     **Background**

GHC is a Texas entity that manufactures and distributes dietary supplements and natural health-care products over the internet and via authorized distributors and resellers.  Doc. 15 ¶ 1. Dr. Edward Group, GHC's President and CEO, founded GHC in 1998.  *Id.* ¶ 2.  GHC's leading product is "Oxy-Powder," an oxygen-based colon cleanser.  Decl. of Dr. Edward F. Group, III ¶ 2 (Pl.'s Ex. 12).  GHC has used the Oxy-Powder name and associated trade dress since 1999.  *Id.*

¶ 4.  Oxy-Powder is well known in the industry and is sold around the world.  *Id.* ¶ 4.  In June 2006, GHC registered the trademark "Oxy-Powder," Registration No. 3,102,973, from the United States Patent and Trademark Office (USPTO).  *See* Trademark Record (Pl.'s Ex. 7).  In January 2014, GHC registered another trademark, Registration No. 4,475,297, for the "GMO Free" emblem that appears on the Oxy-Powder label.  *See* Certificate of Registration (Pl.'s Ex. 6).  GHC has invested significant sums to build and maintain the quality and reputation of Oxy-Powder.  Pl.'s Ex. 12 ¶¶ 5–6.

Defendant Debbie Justus, individually and d/b/a Quantum Vibes and Oxy-Health Canada, has been the leading Canadian distributor of Oxy-Powder since 2004.  *Id.* ¶ 10.  Defendants Nutritional Brands, Inc., Nutritional Beverages, LLC, Aerobic Life Industries, Inc., Jason Pratte, Tamera Leonard, and Guillermo Salazar (collectively, the "Nutritional Brands Defendants" or "NBI") are related entities and individuals who also manufacture and distribute nutritional supplements including several oxygen-based colon cleansers.  Def.'s Resp. to Appl. for Prelim. Inj. at 2 (Doc. 13).  NBI brands and sells their own products and also formulate and manufacture nutritional supplements for third parties.  *Id.*  NBI's third-party manufacturing arrangements are either "contract" arrangements or "private label" arrangements.  In a contract arrangement, NBI manufactures the product in accordance with the customer's specifications for the ingredients, process and labeling.   In a private label arrangement, NBI manufactures the product in accordance with its own procedures and the customer supplies the label.

Between 2003 and 2012, Aerobic Life manufactured Oxy-Powder for GHC through a contract arrangement.  Pl.'s Ex. 12 ¶ 8.  In 2012, Aerobic Life's performance became "unreliable and unstable."  *Id.*  This change is attributed to Aerobic Life's President Jason Pratte's increasing dependence on methamphetamine.  *Id.*; *see also* Decl. of Dr. Laurence Royse ¶ 3 (Pl.'s Ex. 15);

Emails between Group and Pratte (Pl.'s Ex. 9); Emails between Group and "Friends of Jason Pratte" (Pl.'s Ex. 16).  Pratte began having paranoid delusions that employees at Aerobic Life were involved in an intricate plot to harm him and his family.  *See* Pratte's Petition for Injunction Application Against Laurence Royse (Pl.'s Ex. 22); Pl.'s Ex. 20 ¶ 3; Brian Ostrom's Petition for Injunction Application Against Jason Pratte (Pl.'s Ex. 23).  After Pratte terminated Dr. Laurence Royse and Lenny Amado, two employees who were integral to the production of Oxy-Powder, the quality and consistency of Aerobic Life's production of Oxy-Powder deteriorated.  Pl.'s Ex. 12 ¶ 8.  In June 2012, GHC terminated its contract with Aerobic Life. *Id.*

Following the termination of the relationship, NBI filed an application to secure rights to sell Oxy-Powder in Canada.  Defendant Tamera Leonard, the Director of Global Distribution and Private Label Division of Nutritional Brands, Inc. and Nutritional Beverages, LLC, contacted Defendant Debbie Justus and informed her that NBI would be taking actions to block the importation of GHC's Oxy-Powder into Canada.  Dep. of Debbie Justus at 14:7–12. (Pl.'s Ex. 21).  Leonard told Justus that GHC's Oxy-Powder would no longer be available in Canada and the only way to get Oxy-Powder would be through NBI.  *Id.* at 25:3–14.  As Justus's business is largely dependent on sales of Oxy-Powder, Justus agreed to sign a distribution agreement with NBI, in violation of her distribution agreement with GHC.  *Id.* at 14:13–24.

Leonard and Justus agreed to a private label arrangement whereby NBI would manufacture the product using its own specifications and formula and then apply Justus's private label.  *Id.* at 47:23–48:18.  Leonard worked with Justus to create her private label for the new product.  *See* Emails between Tamera Leonard and Debbie Justus (Pl.'s Ex. 4).  Justus initially requested that the product be labeled "Oxy-Powder," but after Leonard said she would have to choose another name Justus chose "Oxy-Health Powder" to incorporate the name of her

business—Oxy-Health Canada.  Pl.'s Ex. 21 at 22:1–12; 47:22–48:10.  The label that Justus and the NBI Defendants created for Oxy-Health Canada is conspicuously similar to the Oxy-Powder label.  *Compare* Oxy-Powder Label (Pl.'s Ex. 15) *with* the Oxy-Health Powder Label (Pl.'s Ex. 5).  GHC's Oxy-Powder label has a distinctive appearance with many unique non-functional features, including: a yellow, green and blue colored background, darker on the top and bottom of the label, and lighter in the middle of the label; vegetative background motifs in the form of a vine; large-font blue block lettering of the federally registered trademark "OXY-POWDER;" a bottom border consisting of a repeating sequence of white, blue, green and yellow colored blocks; another bottom boarder consisting of a pattern of two rows of gold dots; and three roundel symbols reading "VEGAN," "GMO FREE," and "MADE IN THE USA."  By comparison, the Oxy-Health Powder Label features similar or identical non-functional features including: a yellow, green and white background that is darker at the top and bottom of the label and lighter in the middle; vegetative background motifs in the form of grass; large-font green block lettering stating "OXY-HEALTH POWDER;" a bottom border consisting of a repeating sequence of white, blue, green and yellow colored blocks; another bottom boarder consisting of a pattern of two rows of gold dots; and three roundel symbols reading "VEGAN," "NON GMO," and "MADE IN USA."

Justus placed an order with NBI for 168 bottles of Oxy-Health Powder and began filling her customers' orders for Oxy-Powder with Oxy-Health Powder.  Pl.'s Ex. 21 at 49:21–24; *see also* Recorded Telephone Conversation Between Group and Justus (Pl.'s Ex. 1); Bottle of Oxy-Health Powder Ordered by GHC (Pl.'s Ex. 11); Decl. of Julio Torres (Pl.'s Ex. 19 ¶ 6); Decl. of Luis Chavez ¶ 5 (Pl.'s Ex. 18); Emails Exchanged Between GHC and Canadian Customer Tom Young (Pl.'s Ex. 9).  GHC learned that Justus was selling Oxy-Health Powder through customer

complaints to GHC and by covertly placing its own order with Oxy-Health Canada's website. *Id.*

Although the labels are virtually identical, the active ingredients in Oxy-Powder are not contained in Oxy-Health Powder. Dr. Royse, the former employee of Aerobic Life responsible for manufacturing Oxy-Powder, testified that the formula used in Oxy-Health Powder is far less effective than the formula used in Oxy-Powder and that customers have noticed and would continue to notice a difference in the quality of the two products. GHC complains that the similar names, labels, advertising copy and trade dress used by Defendants' Oxy-Health Powder creates confusion among GHC's Oxy-Powder customers, and that the inferior quality of Oxy-Health Powder jeopardizes the goodwill and reputation of Oxy-Powder. Doc. 15 ¶ 29. GHC further argues that NBI's use of the Oxy-Health Powder label nullifies GHC's right to the exclusive use of its trademarks and trade dress. *Id.* GHC also complains that the Nutritional Brands Defendants have threatened to fraudulently block the sale of Oxy-Powder in Canada and the United Kingdom, thereby putting the entire brand at risk. During the hearing, Jason Pratte testified that he did apply for a Canadian trademark for the "Oxy-Powder" mark and that he intends to file applications in other countries where GHC has not secured its rights to the "Oxy-Powder" mark.

GHC has moved for a preliminary injunction that enjoins the Nutritional Brands Defendants from:

(1) selling, promoting, advertising, manufacturing, offering for sale, distributing, or receiving payments for "Oxy-Health Powder" or "Oxy-Powder" natural dietary supplement, any counterfeit copy of same, as well as any colorable imitation of same;

(2) attempting to bar importation or exportation of GHC's "Oxy-Powder" Product by means of making false or fraudulent statements to any customs officials or other third parties;

(3) threatening, or making fraudulent statements regarding Oxy-Powder, to GHC
distributors or wholesalers for the purposes of obtaining a competitive advantage
or inducing GHC distributors or wholesalers to breach their contracts with GHC.

Proposed Order Granting Prelim. Inj. (Doc. 16).   Defendant Justus has already agreed to a
preliminary injunction.  Agreed Prelim. Inj. (Doc. 9).

Defendants argue that an injunction is inappropriate because (1) Plaintiffs are not likely
to succeed on the merits of their claims of trademark infringement or trademark dilution; (2)
Plaintiffs are not at risk of suffering irreparable harm; (3) NBI would be greatly harmed by an
injunction prohibiting actions outside the United States in countries where Plaintiffs do not have
superior trademark rights.  Doc. 13 at 4–10.  Defendants argue in the alternative that even if the
Court concludes that an injunction is appropriate, it should not enjoin actions with respect to
Canada or any other foreign nation because GHC does not have superior rights to the "Oxy-
Powder" mark outside the United States.  *Id.* at 11–12.  Defendants also object to specific
language in the proposed injunction including (1) the phrase "receiving payment" in the first
section of the proposed injunction, because it would prohibit Defendants from investing in
foreign companies that may manufacture products which, marketed in foreign countries, may not
infringe Plaintiffs' trademark rights; and (2) the word "threatening" at the beginning of the third
section of the proposed injunction, as it is "exceedingly vague."  *Id.* at 14–15.[1]

## II.    Legal Standard

"A preliminary injunction is an 'extraordinary remedy' which should only be granted if
the party seeking the injunction has 'clearly carried the burden of persuasion' on all four
requirements."  *Nicols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008).  To obtain a

---

[1] Defendants also argue in their brief that Plaintiffs' application for injunction should be denied because the formula for Oxy-Powder was stolen from Aerobic Life's product Mag07.  *Id.* at 15.  However, it appears this argument has been abandoned as Defendants did not offer any evidence supporting this argument.

preliminary injunction, GHC must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat that it will suffer irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest.  *Tex. Med. Providers Performing Abortion Servs. v. Lakey,* 667 F.3d 570, 574 (5th Cir. 2012).  Each of these factors presents a mixed question of fact and law.  *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279 (5th Cir. 2012).  An injunction is an appropriate remedy to cure trademark infringement under the Lanham Act.  15 U.S.C. §§ 1116, 1125(c); *Pebble Beach Co. v. Tour 18 I, Ltd.*, 942 F. Supp. 1513, 1572 (S.D. Tex. 1996).

## III.    Discussion

### A.    Substantial Likelihood of Success on the Merits

"There are two elements to a successful claim of infringement under the Lanham Act.[2] The plaintiff must first establish ownership in a legally protectable mark, and second, show infringement by demonstrating a likelihood of confusion."  *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 237 (5th Cir. 2010) (internal quotation marks and citations omitted).

"To be protectable, a mark must be distinctive, either inherently or by achieving secondary meaning in the mind of the public."  *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008).  A mark has achieved secondary meaning in the mind of the public when "the primary significance of the mark is to identify the source of the product rather than the product itself."  *Amazing Spaces, Inc.*, 608 F.3d at 237 (citing *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210–211 (2000)).  Proof of registration of a mark with the

---

[2] The Lanham Act provides a trademark registrant a civil right of action against any person who "uses (1) any reproduction, counterfeit, copy or colorable imitation of the mark; (2) without the registrant's consent; (3) in commerce; (4) in connection with the sale, offering for sale, distribution or advertising of any goods; (5) where such use is likely to cause confusion or to cause mistake or to deceive."  15 U.S.C. § 1114; *Boston Prof'l Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.3d 1004, 1009–10 (5th Cir. 1975).

USPTO constitutes prima facie evidence that the mark is valid and that the registrant has the exclusive right to use the mark in commerce with respect to the specified goods or services.  15 U.S.C. §§ 1057(b) & 15 U.S.C. § 1115(a); *Amazing Spaces, Inc.* 608 F.3d at 237.

The "Oxy-Powder" mark has been registered since 2006 and GHC has used the mark continuously and in connection with the specified good for more than five years, thereby making the mark incontestable under the Lanham Act.  15 U.S.C. § 1065(a).  Defendants do not contest the mark's validity.  Therefore, the Court finds that the Oxy-Powder mark is valid.  The only remaining inquiry is whether the allegedly infringing mark creates a likelihood of confusion.

"Likelihood of confusion is synonymous with probability of confusion, which is more than a mere possibility of confusion."  *Elvis Presley Enter., Inc. v. Capece*, 141 F.3d 188, 193 (5th Cir. 1998).  The Fifth Circuit considers the following factors in determining whether a likelihood of confusion exists: "(1) strength of the plaintiff's mark; (2) similarity of design between the marks; (3) similarity of the products; (4) identity of retail outlets and purchasers; (5) similarity of advertising media use; (6) the defendant's intent; (7) actual confusion; and (8) degree of care exercised by potential purchasers."  *American Rice, Inc.*, 518 F.3d at 329 (citing *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 170 (5th Cir. 1986)).  "The absence or presence of any one factor ordinarily is not dispositive; indeed, a finding of likelihood of confusion need not be supported even by a majority of the…factors."  *Id.* (citing *Conan Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 150 (5th Cir. 1985)).  The court is free to consider other factors it deems relevant to determining whether a likelihood of confusion exists.  *Elvis Presley Enter., Inc.*, 141 F.3d at 194.  Likelihood of confusion is a factual question reviewed for clear error.  *Id.* at 197.

1.      *Strength of the Mark*

In evaluating the strength of a mark, courts focus on the senior user's mark.  *Elvis Presley Enter., Inc.*, 141 F.3d at 200.  Stronger marks deserve greater protection because there is an increased likelihood that consumers will confuse the junior user's mark with that of the senior user.  *Id.*  "Marks are normally assigned to categories of generally increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful."  *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 227 (5th Cir. 2009) (citing *Two Pesos, Inc. v. Cabana, Inc.*, 505 U.S. 763, 768 (1992)).  "The latter three categories of marks, because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection."  *Id.*

> A generic term refers to the class of which a good is a member.  A descriptive term provides an attribute or quality of a good.  Generic terms receive no trademark protection, while descriptive terms merit protection only if they have secondary meaning.  A suggestive term suggests, but does not describe, an attribute of a good; it requires the consumer to exercise his imagination to apply the trademark to the good.  More distinctiveness and less natural or literal content correspond with increased mark strength.  It is proper to give more weight to distinctive portions of a mark and less weight to unremarkable or generic portions.

*Id.* (internal quotation marks and citations omitted).  Any given term's correct classification is a factual issue.  *Id.*

Defendants contend that the mark Oxy-Powder is not strong because there are numerous nutritional supplements, including many colon cleansers, in the United States market with names that include the term "OXY."  Doc. 13 at 6–7.  Plaintiffs presented testimony that the Oxy-Powder mark is well known in the oxygen-based colon cleansing market.

Both "oxy" and "powder" are descriptive terms.  "Oxy" denotes that the product is made using a chemical compound that contains oxygen and "powder" describes the texture or

consistency of the formula, which is then encapsulated.  These terms are entitled to protection only if they have acquired secondary meaning.  GHC has obtained incontestable status for the Oxy-Powder mark, conclusively establishing secondary meaning for trademark protection purposes.  *See Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1184–85 (5th Cir. 1980) ("An incontestable mark cannot be challenged as lacking secondary meaning; such marks are conclusively presumed to be nondescriptive or to have acquired secondary meaning.").  Therefore, this factor weighs in favor of GHC.

2.  *Similarity of Design Between the Marks*

"The similarity of the marks is determined by comparing the marks' appearance, sound and meaning."  *Elvis Presley Enter., Inc.*, 141 F.3d at 201.  "The relevant inquiry is whether, under the circumstances of the use, the marks are sufficiently similar that prospective purchasers are likely to believe that the two users are somehow associated."  *Id.* (internal quotation marks and citations omitted).

Defendants argue that the difference between "Oxy-Powder" and "Oxy-Health Powder" is "obvious and significant" because "the insertion of the word 'health' gives the mark a distinct commercial impression."  Doc. 13 at 7.  The Court disagrees and finds the marks to be very similar, particularly in light of the fact that Defendants copied much of the trade dress associated with the mark.  The marks use similar typeface with bold lettering and a dash.  The word "health" is merely another descriptor for the product which also appears on GHC's label for Oxy-Powder.  The Oxy-Powder label includes the word "health" just below and to the right of the name "Oxy-Powder" in an emblem that says "Natural Health" and "Organic Living."  Also, Plaintiffs' name "Global Healing Center" appears directly above the "Oxy-Powder" mark.

Within the context of Plaintiffs' trade dress, the addition of the word health is only a minor distinction and gives the impression that Oxy-Health Powder is a derivative of Oxy-Powder.

Furthermore, GHC provided evidence that at least one Canadian customer actually did believe that the two users were associated.  The customer emailed GHC asking, "Are 'Oxy-Powder' and 'Oxy-Health Powder' the same things?"  and "Is this just a re-label for Canadian markets?"  *See* Emails Exchanged Between GHC and Canadian Customer Tom Young (Pl.'s Ex. 8).  Given similarities of the marks' appearance, sound and meaning, combined with the fact that both products are intended for the same use, customers are likely to believe that "Oxy-Health Powder" is associated with "Oxy-Powder."  This factor weighs in favor of GHC.

    *3.*    *Similarity of the Products*

"The greater the similarity between the products and services, the greater the likelihood of confusion." *Elvis Presley Enter., Inc.*, 141 F.3d at 202 (citing *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500, 505 (5th Cir. 1980).  Here the products are intended for the same use—colon cleansing.  They both come in bottles of 120 "vegetarian capsules" and are intended to "release beneficial nascent oxygen" into the digestive system.  *See* Pl.'s Ex. 15; Pl.'s Ex. 5.  Customers searching for an oxygen-based colon cleanser would easily be confused by the allegedly infringing product.  This factor weighs heavily in favor of GHC.

    *4.*    *Identity of the Retail Outlets and Purchasers*

The identity of the retail outlets and purchasers are the same.  Defendants attempt to argue they are different because Oxy-Health Powder was sold only to customers in Canada. Whether the purchasers were American or Canadian is immaterial to the issue.  Defendants sold the allegedly infringing product to the leading Canadian distributor of Oxy-Powder who sold it to her customers in place of Oxy-Powder.  This factor clearly weighs in favor of GHC.

5.      *Similarity of Advertising Media Use*

Courts look for advertising in similar media outlets as an indication that consumers might be confused as to the source of similar products.  Dr. Group testified that GHC has spent millions in marketing and advertising its products, particularly online, but also in magazines, at trade shows, and on radio and television.  No evidence regarding the similarity of advertising media used by NBI was submitted.  This factor is neutral.

6.      *Defendant's Intent*

Proof of a defendant's intent to benefit from the good reputation of a plaintiff's product provides compelling evidence of a likelihood of confusion.  *Am. Rice, Inc.*, 518 F.3d at 332 (citing *Oreck Corp.*, 803 F.2d at 172–73).  "[I]f the mark was adopted with the intent of deriving benefit from the reputation of (the plaintiff), that fact alone may be sufficient to justify the inference that there is confusing similarity."  *Id.* (citing *Chevron Chem. Co. v. Voluntary Purchasing Grps., Inc.*, 659 F.2d 695, 703–04 (5th Cir. 1981)).

Defendants contend that NBI did not intend to infringe Plaintiffs' trademark rights.  Doc. 13 at 7.  The evidence belies this argument.  Defendant is a former manufacturer of Oxy-Powder. The record shows that Debbie Justus and NBI cooperated to make the Oxy-Health Powder name and label in a manner strikingly similar to Oxy-Powder's name and label.  The prior history between the parties and the strikingly similar name and label Defendants chose for their product supports an inference that Defendants acted with intent to capitalize on the goodwill and reputation of Oxy-Powder.  "It is so easy for a business man who wishes to sell his goods upon their merits to select marks and packagings that cannot possibly be confused with his competitor's that 'courts look with suspicion upon one who, in dressing his good for the market, approaches so near to his successful rival that the public may fail to distinguish between them.'"

*Chevron Chem. Co.*, 659 F.2d at 704 (citing *Florence Mfg. Co. v. J.C. Dowd & Co.*, 178 F. 73, 75 (2d Cir. 1910)).  "As soon as we see that a second comer in a market has, for no reason that he can assign, plagiarized the 'make-up' of an earlier comer, we need no more…"  *Id.* (quoting *Am. Chicle Co. v. Topps Chewing Cum, Inc.*, 208 F.2d 560, 563 (2d Cir. 1953) (L. Hand, J.)). The factor weighs very heavily in favor of GHC.

       7.     *Actual Confusion*

The best evidence of likelihood of confusion is evidence of actual confusion.  *Exxon Corp.*, 628 F.2d at 506 (citing *Roto-Rooter Corp. v. O'Neal*, 513 F.2d 44 (5th Cir. 1975)). "[W]hile very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof." *Pebble Beach Co.*, 942 F. Supp. at 1547 (citing *Fuji Photo Film v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 597 (5th Cir. 1985)).  *See Louisiana World Expo., Inc. v. Logue*, 746 F.2d 1033, 1041 (holding one instance of actual confusion sufficient to satisfy actual confusion factor).  Plaintiffs offered evidence of actual confusion from a GHC customer in Canada.  "To show actual confusion, a plaintiff may rely on anecdotal instances of consumer confusion." *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 447, 486 (5th Cir. 2004).  This factor, while not dispositive, weighs heavily in favor of GHC.  *See, e.g.*, *Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155, 1159–60 (5th Cir. 1982) (upholding district court's finding of trademark infringement based in part on plaintiff's evidence of actual confusion).

       8.     *Degree of Care Exercised by Potential Purchasers*

No evidence regarding the degree of care exercised by potential purchasers was submitted.  Therefore, this factor is neutral.

Nearly all of the likelihood of confusion factors weigh in favor of GHC.  The Court finds that GHC has met its burden to show a substantial likelihood of success on its trademark infringement claim by establishing ownership of a legally protectable mark and demonstrating a likelihood of confusion with Defendants' allegedly infringing mark.

**B.**      **Substantial Threat That  GHC Will Suffer  Irreparable Harm**

The Court finds that GHC has met its burden to show that it will suffer irreparable harm if Defendants are not enjoined.  Dr. Group testified that GHC has spent millions of dollars building the Oxy-Powder brand and that sales of Oxy-Powder account for 95% of GHC's income.  Evidence in the record clearly shows that NBI, and Pratte in particular, intend to secure rights to the Oxy-Powder mark outside the United States.  Defendant Pratte testified that he has already filed an application to secure rights to the Oxy-Powder mark in Canada despite knowing that GHC has been selling Oxy-Powder there since 2004.   Although Pratte did not state specifically that he intends to secure rights to the Oxy-Powder name outside Canada, he did testify that he did not perceive any illegality in doing so.  Arrogating the Oxy-Powder name and goodwill outside the United States would obviously be harmful to GHC.  In addition, there was an abundance of testimony and evidence presented regarding Pratte's habitual drug use and his unpredictable, erratic, and threatening behavior.  Pratte himself testified that he believes Dr. Group and Lenny Amado are part of the conspiracy to harm him.  These circumstances suggest a real and serious threat that Pratte may attempt to obtain rights to the Oxy-Powder mark outside the United States.  Defendants' activities threaten GHC's exclusive rights to its trademarks and trade dress.  Damages caused by the infringement and dilution of GHC's trademarks and trade dress cannot reasonably be calculated.

The evidence also supports an inference that Defendants manufactured Oxy-Health Powder with intent to create confusion in the minds of GHC's customers and capitalize on Oxy-Powder's goodwill and reputation. The Defendants interfered with GHC's distributor network by contacting Debbie Justus, telling her that she would no longer be able to purchase GHC's Oxy-Powder for Canadian customers, and inducing her to fill orders for Oxy-Powder with Oxy-Health Powder. The inferior quality of Oxy-Health Powder jeopardizes Oxy-Powder's continued success, which Dr. Group testified is largely built positive consumer reviews on various internet forums and message boards. The internet-based nature of GHC's business means that it is vulnerable to negative consumer reviews, which could have a substantial and detrimental effect on Oxy-Powder's status in its consumer market. Cumulatively, these facts support a finding of substantial threat that GHC will suffer irreparable harm if Defendants are not enjoined.

## C. The Threatened Injury Outweighs Any Damage That the Injunction Might Cause the Defendant

Defendants argue that an injunction preventing them from manufacturing or selling products under names similar to "Oxy-Health Powder" in countries where Plaintiffs do not have superior trademark rights to that mark would be "extremely harmful" to their business. They argue that they will be harmed if one of their customers wishes to use a mark that is confusingly similar to Oxy-Health Powder in a country outside the United States and they are not able to serve that customer. This argument "merits little equitable consideration in light of Defendant's willful use of an infringing trademark." *Pro Hardware, Inc. v. Home Ctrs. of Am., Inc.*, 607 F. Supp. 146, 154–55 (S.D. Tex. 1984) (citing *Helene Curtis Indus. v. Church and Dwight*, 560 F.2d 1325, 1333 (7th Cir. 1977). The balance-of-hardships weigh in favor of "awarding protection to those who over a substantial number of years have built [their mark] into a valuable

and essential asset of their business."  The Court finds the balance of hardships weigh in GHC's favor.

### D.       The Injunction Will Not Disserve the Public Interest

Compliance with Congressional statutes such as the Lanham Act is always in the public interest and the public is served by enjoining the use of infringing marks.  *Quantum Fitness Corp. v. Quantum Life Style Cntrs.*, 83 F. Supp. 2d 810, 832 (S.D. Tex. 1999).  Protecting GHC's mark from infringement and preventing consumer confusion in the marketplace is in the public's interest.

GHC has satisfied all four requirements of a preliminary injunction based on its trademark infringement claim alone.  As such, the Court need not consider whether GHC has met its burden to show entitlement to a preliminary injunction based on its other causes of action.

## IV.     Extraterritorial Application of the Lanham Act

Defendants object to the proposed injunction as overbroad because it enjoins commerce outside the United States and Canada and Plaintiffs do not have superior rights to the name Oxy-Powder outside the United States.  Doc. 13 at 12.

The lead case in the Fifth Circuit on the extraterritorial application of the Lanham Act is *Am. Rice Inc. v. Ark. Rice Growers Co-op Assoc.*, 701 F.2d 408 (5th Cir. 1983).  In that case, American Rice Inc. ("ARI") sued the Arkansas Rice Growers Co-operative Association ("Riceland") for trademark infringement based on its sales, in Saudi Arabia, of rice labeled in a confusingly similar manner to ARI's.  *Id.* at 410–12.  After holding a hearing, the district court found that ARI had shown a substantial likelihood of success on the merits and issued a preliminary injunction preventing Riceland's sale of infringing products in Saudi Arabia. Riceland immediately appealed the district court's decision to the Court of Appeals arguing that

the district court lacked jurisdiction under the Lanham Act to issue an injunction in Saudi Arabia.

*Id.* at 412.  Affirming the district court's order, the Fifth Circuit concluded:

> [U]nder *Bulova* and *Luft* certain factors are relevant in determining whether the contacts and interests of the United States are sufficient to support the exercise of extraterritorial jurisdiction.  These include the citizenship of the defendant, the effect on United States commerce, and the existence of a conflict with foreign law.  The absence of any one of these is not dispositive.  Nor should a court limit its inquiry exclusively to these considerations.  Rather, these factors will necessarily be the primary elements in any balancing analysis.

*Id.* at 414 (citing *Steele v. Bulova Watch Co.*, 344 U.S. 280 (1952), and *George W. Luft Co. Inc.*

*v. Zande Cosmetic Co. Inc.*, 142 F.2d 536 (2d Cir. 1944)).  These three factors: citizenship, effect

on United States commerce, and conflict with foreign law, are known as the *Bulova* factors.

Applying the *Bulova* factors in *American Rice*, the Court of Appeals found (1) that Riceland was

an American citizen; (2) that it had affected United States commerce by producing goods in the

United States and sending them to Saudi Arabia where they diverted sales away from ARI; and

(3) that Riceland's Saudi trademark did not create a conflict of laws because no Saudi court had

ever awarded Riceland a superior right to use the mark.  *Id.* at 415.

## V.   Discussion

GHC has satisfied the *Bulova* factors to justify the exercise of extraterritorial jurisdiction

in this case.  The first factor is not at issue.  The Nutritional Brands Defendants are American

individuals and corporations based in Phoenix, Arizona.  With regard to the second factor,

Defendants argue that Plaintiffs have failed to demonstrate that Defendants' conduct has had a

substantial effect on interstate commerce because they have not offered any evidence that

Defendants' sales of Oxy-Health Powder caused confusion among United States consumers or

harmed Plaintiffs' reputation in the United States.  This argument is unavailing.  The Court in

*American Rice* gave great weight to the fact that the defendant's processing, packaging,

transportation, and distribution activities took place in the United States, notwithstanding the fact that the "consummation of the unlawful activity occurred on foreign soil." *Id.* The Court cited *Bulova* stating, "we do not deem material that petitioner affixed the mark 'Bulova' in Mexico City rather than here, or that his purchases in the United States when viewed in isolation do not violate any of our laws. They were essential steps in the course of business consummated abroad; acts in themselves legal lose that character when they become part of an unlawful scheme." *Id.* (citing *Bulova*, 344 U.S. at 287).

Like the defendant in *American Rice*, most of Defendants' infringing activities occurred in the United States including designing the infringing label, printing the labels, affixing the labels, advertising the infringing product, offering to sell the product, selling the product, manufacturing the product, entering into a distribution agreement to sell the product, shipping the product, and receiving payment for the product. Whether Plaintiffs have proven that customers in the United States were confused by Defendants' counterfeit product, or proven that GHC's reputation in the United States suffered some harm is immaterial to the issue. The second factor is satisfied.

With regard to the third factor, the court in *American Rice* left open the possibility that where it "would be an affront to Saudi sovereignty or law to exercise extraterritorial jurisdiction under the Lanham Act, such jurisdiction should not be exercised." However, "[a]bsent a determination by a Saudi court that Riceland has a legal right to use its marks, and that those marks do not infringe ARI's…mark, we are unable to conclude that it would be an affront to Saudi sovereignty or law if we affirm the district court's injunction prohibiting the defendant from injuring the plaintiff's Saudi Arabian commerce conducted from the United States." *Id.* at 415–16.

In this case, the Nutritional Brands Defendants have not produced any evidence that a court in Canada or any other nation has held that they own any legal rights to the "Oxy-Powder" name.  As such, the Court's exercise of extraterritorial jurisdiction in this case does not offend the sovereignty of any other nation.

Defendants make two objections to specific language in the proposed injunction.  Doc. 13 at 14–15.  First, Defendants object to the phrase "receiving payment" in the first section of the proposed injunction as overbroad because it would prohibit Defendants from investing in foreign companies that may manufacture products which, marketed in foreign countries, would not infringe Plaintiffs' trademark rights.  Defendants further object that the prohibition on "receipt of payment" has no basis in the Lanham Act, which describes trademark infringing as use of a mark "in connection with the sale, offering for sale, distribution or advertising of any goods."  15 U.S.C. § 1114.  Plaintiffs did not respond to this objection in any of the supplemental briefs filed with the Court.  Nevertheless, the Court overrules the objection.  Defendants' objection is weakened significantly by the Court's finding that extraterritorial application of the injunction is appropriate in this case.  In addition, the Court finds that the injunction is not broader than necessary to achieve the purpose of protecting Plaintiffs' mark from trademark infringement. The proposed injunction does not prevent Defendants from receiving payments for oxygen-based colon cleansers under any non-infringing marks.  It enjoins Defendants from only receiving payment from "'Oxy-Health Powder' or 'Oxy-Powder' natural dietary supplement, any counterfeit copy of same, as well as any colorable imitation."  Defendants have not provided evidence that they or any of their customers have rights to these marks or any confusingly similar marks in any other country.  Plaintiffs, however, have provided evidence that Defendants have attempted to arrogate these marks in other countries which would irreparably harm GHC's

business.  The Court finds that an injunction which includes a prohibition on receiving payments is necessary and appropriate in this case.

Next, Defendants object to the word "threatening" at the beginning of the third section of the proposed injunction as it is "exceedingly vague."  Defendants contend this word could apply to anything from a "polite letter to a lawsuit filed in a U.S. or foreign court."  Plaintiffs did not address this objection.  Nevertheless, the Court overrules the objection.  The word "threatening" is not vague.  The provision specifically references GHC's "distributors and wholesalers," and Defendants' prior actions in connection with Debbie Justus make clear what this provision is meant to enjoin.

## VI.    Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that Plaintiffs' motion for preliminary injunction is granted.  Defendants, their agents, servants, employees, attorneys, and all persons or entities acting in concert or participation with them who receive actual notice of this Order by service or otherwise are hereby are preliminarily **RESTRAINED AND ENJOINED** from

> (1) selling, promoting, advertising, manufacturing, offering for sale, distributing, or receiving payments for "Oxy-Health Powder" or "Oxy-Powder" natural dietary supplement, any counterfeit copy of same, as well as any colorable imitation of same;

> (2) attempting to bar importation or exportation of GHC's "Oxy-Powder" Product by means of making false or fraudulent statements to any customs officials or other third parties;

> (3) threatening, or making fraudulent statements regarding Oxy-Powder, to GHC distributors or wholesalers for the purposes of obtaining a competitive advantage or inducing GHC distributors or wholesalers to breach their contracts with GHC.

> It is further

**ORDERED** that the injunction issued contemporaneously herewith shall be effective upon the posting by GHC of a bond in the amount of Five Thousand and 00/100 Dollars U.S. ($5,000.00 U.S.).  FED. R. CIV. P. 65(c); *Phillips v. Charles Schreiner Bank*, 894 F.2d 127, 131 (5th Cir. 1990).  The Court finds that this amount is appropriate to protect the Nutritional Brands Defendants in the event that the injunction is later determined to be in error.  It is further

ORDERED that a scheduling conference be held by the Honorable Magistrate Judge Frances H. Stacy at which an accelerated date for trial on the merits shall be set.

SIGNED at Houston, Texas, this 6th day of March, 2014.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE